IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | CASE NO. 8:10CV184 |
| | ) | |
| BROWN & ASSOCIATES, LTD., | ) | Bankruptcy No. BK08-83078 |
| | ) | Chapter 11 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | Bankruptcy Adv. No. 09-8003 |
| BROWN & ASSOCIATES, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM OPINION |
| | ) | |
| POSITIVE PROPERTY MANAGEMENT, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| POSITIVE PROPERTY MANAGEMENT, LLC, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| BROWN & ASSOCIATES, | ) | |
| | ) | |
| Appellee. | ) | |

This matter is before the court on appeal from an order and a Judgment issued by the United States Bankruptcy Court for the District of Nebraska[1] (the "bankruptcy court") finding against Positive Property Management, LLC ("PPM"). PPM elected to have the

---

[1] The Honorable Timothy J. Mahoney, United States Bankruptcy Court for the District of Nebraska.

appeal heard by this Court. (Filing No. 4.) The matter has been fully briefed (Filing Nos. 9, 10, 11) and is ripe for decision.[2]

## JURISDICTION

This Court has jurisdiction over appeals from final judgments and orders of the Bankruptcy court under 28 U.S.C. § 158(a)(1). *Leonard v. Dorsey & Whitney LLP,* 553 F.3d 609, 612 (8th Cir. 2009).

## PROCEDURAL BACKGROUND

This adversary proceeding was removed from state court to the Bankruptcy court upon the filing of Brown & Associates, LTD ("Brown"), for Chapter 11 bankruptcy. The matter involves the interpretation of a restrictive use paragraph in a lease.[3] United States Bankruptcy Judge Timothy J. Mahoney denied PPM's motion for summary judgment because material factual matters were in dispute. Trial was held, and Judge Mahoney determined that PPM breached the lease, and the breach was material therefore allowing Maple, Inc., to terminate the lease. He did not award monetary damages. This appeal followed.

The record in a bankruptcy case on appeal to the district court is governed by Federal Rule of Bankruptcy Procedure 8006. Each party submitted a designation of record on appeal in compliance with Rule 8006.

---

[2] The Court has determined that oral argument will not be allowed as "the facts and legal arguments are adequately presented in the briefs and record and the decisional process would not be significantly aided by oral argument." Fed. R. Bankr. P. 8012.

[3] Maple, Inc., d/b/a Sparks Computerized Car Care ("Maple, Inc."), leased property from PPM. Brown was the principal shareholder of Maple, Inc. and a guarantor of the lease. (Filing No. 13, at 3; Filing No. 91, at 1.)

## FACTUAL BACKGROUND

The following facts, taken from Judge Mahoney's order, are not in dispute:

The parties entered into a lease of improved real property in 1989. Positive Property Management, LLC ("PPM"), is the owner of the improved property. A corporation owned by Brown & Associates, Ltd. ("Brown"), Maple, Inc., d/b/a Sparks Computerized Car Care, was the tenant under the original lease from 1989 through 1999, and, on a subsequent lease from December 1999 through the time Maple, Inc., notified the landlord of a termination of the lease based upon an alleged breach of the lease by the landlord in November of 2002. Brown is a guarantor of the lease.

PPM eventually sued Maple, Inc., and Brown in Douglas County District Court for damages resulting from an alleged breach of the lease, the termination by Maple, Inc. Brown then filed this Chapter 11 case and removed the state court action to the bankruptcy court.

Both leases have identical language concerning a restriction on the type of business that the landlord may permit in the business center which the landlord owns and which is adjacent to the property being used by Maple, Inc. The Maple, Inc., property is identified as 8815 Maple Street, Omaha, Nebraska. The adjacent property includes a number of bays which businesses may rent, and has always included a business called "Sports & Imports Auto Sales" which is a used car sales lot and rental lot. Mr. Bristol, the owner of PPM, is also the owner of Bristol, Inc., d/b/a Sports & Imports. Mr. Bristol executed the lease in question on behalf of PPM.

The lease in question, Filing #21, under the "USE" paragraph includes the following: "The landlord shall not use, suffer, permit or consent to the use or occupancy of any part of the developed area for an auto service and repair business similar to that conducted on the Premises by the Tenant."

Although the phrase "developed area" is not defined in the lease, the parties agree that it includes the property leased to Maple, Inc., and the remainder of the property used by Bristol, Inc., d/b/a Sports & Imports, and the remaining building spaces and real property adjacent to 8815 Maple Street that is controlled by Mr. Bristol or one of his corporations.

The dispute concerns the lease language quoted above. That language was in the original 1989 lease and when the parties were in negotiations about the lease which appears at Filing #21, Mr. Bristol sent a draft to Mr. Stern, the president of Maple, Inc., without that restrictive language included. Prior to the negotiations even beginning, Mr. Stern had contacted Mr. Bristol in writing, Filing #22, that Mr. Stern believed that Mr.

Bristol and his company, PPM, were in violation of that provision of the lease. In response to Filing #22, and prior to the execution of the lease at Filing #21, Mr. Bristol denied that he was in violation of the restrictive term of the lease and informed Mr. Stern that the only vehicle repairs that were being performed at Sports & Imports were those necessary to prepare the used cars for sale and those necessary to keep the rental cars properly operating. With that assurance, Mr. Stern, on behalf of his company, executed the new lease and paid the rental payments through October of 2002.

In October of 2002, Mr. Stern employed the services of an attorney to notify Mr. Bristol in writing that it was Mr. Stern's position that from and after the execution of the lease, Sports & Imports continued to provide repair services to customers who were not purchasers of the used vehicles and were not renters of such vehicles. In other words, Mr. Stern believed that repairs on third-party customer vehicles were being performed on the Sports & Imports premises for monetary consideration. The attorney's letter, Filing #23, informed Mr. Bristol that unless such activities immediately ceased, Maple, Inc., would immediately terminate the lease.

By Filing #24, a letter dated November 6, 2002, from counsel for Maple, Inc., the lease was terminated based upon the alleged breach by the landlord.

As mentioned above, PPM sued Maple, Inc., and Brown in Douglas County District Court and requested damages for the remaining lease amounts, less mitigation, plus repairs and utilities, in the approximate amount of $75,000.

At trial, Mr. Bristol, as a representative of PPM and a representative of Bristol, Inc., d/b/a Sports & Imports, admitted that occasionally repair work was performed for money, for individuals who were not purchasers of used cars from the business nor were renting from the business. He was adamant that the restrictive use paragraph could not prohibit Bristol, Inc., d/b/a Sports & Imports, from repairing its own vehicles or from repairing vehicles of persons who had purchased used cars on the installment payment plan when they needed repairs. His position was that if he was unable to repair purchased vehicles, the purchasers would quit paying and it would be harmful to his business. He also insisted that he had been doing such work on purchasers' cars during the time the original lease was in effect, during the time the renewal lease was in effect, and continuing during the time Filing #21 was in effect. He claimed that Mr. Stern was well aware through all those years that repairs were being done on used cars to prepare them for sale and on the rental cars.

>Mr. Bristol, both in depositions and in live testimony at trial, was unable to quantify, either by number of vehicles or by dollar amount, how much business was done with third-party customers that were not purchasers of the used cars. The business records of Sports & Imports show gross revenue from repairs on an annual basis ran from $40,000 to $12,000. Mr. Bristol could not break out the amount attributable to third-party customer work.
>
>It is Mr. Bristol's position on behalf of his companies that the type of repair service he provided, including for third-party customers, did not violate the lease. He bases such an opinion on the fact that the restrictive language prohibits "an auto service and repair business similar to that conducted on the Premises by the Tenant." He says Sports & Imports is a used car and rental business, not an auto service and repair business similar to that conducted by Maple, Inc.
>
>The deposition of Michael Heilig, Filing #86, was admitted into evidence. Mr. Heilig has for many years operated his own business in the same facility that Mr. Bristol operates Sports & Imports. Mr. Heilig's business is to sell used cars. He buys them, brings them to the facility, does whatever repairs are necessary, and puts them on the lot where Sports & Imports' used vehicles are located. He is not an employee of Bristol, Inc., but helps out with repairs to Sports & Imports cars when needed. He is permitted to operate his business on the premises without paying rent because of his occasional mechanic service and sales service to Sports & Imports. He has a sales license for used vehicles and a dealer license for used vehicles.
>
>Mr. Heilig admitted that on occasion he has performed vehicle repair services, for money, in the facility of Sports & Imports, on vehicles that were not his own and were not vehicles he had sold. He insisted that there were very few vehicles that he worked on for pay, but was unable to present any records concerning the number of vehicles or the amount of money that he had received for the repair of the vehicles.
>
>Mr. Stern, president of Maple, Inc., testified that the reason he wanted the language in the lease that is now in question was because he wanted no other business on the adjoining premises that would compete in any way with his car repair business. He testified it was eventually obvious that third-party customers were bringing vehicles to the facility operated as Sports & Imports for repairs for money. Prior to executing the lease, Filing #21, he had insisted that such work cease, and had been assured that there was none of that work happening. His position is that any vehicles being repaired for money on the facility operated by Sports & Imports were in competition with his own business and potentially harmful to his own business.

(Filing No. 91.)[4]

---

[4]All filing numbers are to BK 09-08003, unless otherwise specified.

**STANDARD OF REVIEW**

When a bankruptcy court's judgment is appealed to a district court, the district court acts as an appellate court. Fed. R. Bankr. P. 8013; *Parks v. Anderson,* 406 B.R. 79, 87 (D. Kan. 2009). The district court reviews the bankruptcy court's factual findings for clear error, and its conclusions of law *de novo*. Fed. R. Bankr. P. 8013; *In re Falcon Products, Inc.*, 497 F.3d 838, 840-41 (8th Cir. 2007). The issues before this Court involve the bankruptcy court's interpretation of Nebraska law as applied to the facts of this case. These are issues of law subject to *de novo* review. *See In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 379 (8th Cir. 2000).

**DISCUSSION**

The issues on appeal are whether the bankruptcy court erred in concluding that PPM's conduct was a material breach of the restricted use language in the lease, and whether Maple, Inc.'s alleged acquiescence to that conduct constituted a waiver of its right to claim that PPM breached the lease.

**I.    Material Breach**

PPM argues that Judge Mahoney erred in concluding that Sports & Imports' "incidental" repair work was equivalent to automotive repair work similar to that performed by Maple, Inc.'s repair business and, therefore, constituted a material breach. PPM argues that Judge Mahoney erred in interpreting the relevant clause in the lease.

The Nebraska Supreme Court has stated: "[w]hether or not a breach is material and important is a question of degree which must be answered by weighing the consequences of the breach in light of the actual custom of persons in the performance of contracts

6

similar to the one involved in the specific case." *Domjan v. Faith Reg'l Health Servs.,* 735 N.W.2d 355, 362 (Neb. 2007) (quoting *Phipps v. Skyview Farms, Inc.,* 610 N.W.2d 723, 730-31 (2000)). In other words, "[w]hat constitutes a 'material breach' is a fact-dependent inquiry." *Jeffrey Lake Devel., Inc. v. Central Neb. Pub. Power & Irrig. Dist.,* Nos. A-09-996, -997, and -998, 2010 WL 2990040, at *6 (Neb. App. July 27, 2010) (citing *Phipps,* 610 N.W.2d 730-31).

At trial, John Stern, Maple, Inc.'s president, described why he chose the particular location for his business and why the additional business that went to Bristol, Inc., d/b/a Sports & Imports ("Sports and Imports") was important to him:

> Q   Why was the Maple Street address important to you in terms of renewing the lease?
>
> A   I wanted to become established there. Also, you – with that business, you try to place it to feed off of other businesses in the neighborhood. Repair shops, fleet-type –
>
> Q   Car sales?
>
> A   – car sales. I'm sorry, I didn't mean repair, I mean car sales, fleet-type businesses, other commercial businesses that compliment the business that – I mean, that's part of why you choose the location.
>
> Q   Part of your decision in renewing the lease was that you had hoped there would be some business coming from Sports and Imports?
>
> A   Maybe not directly from Sports and Imports, but from their clientele. I mean, there's some residual-type business by where you place it, so.
>
> Q   And so in order to protect that interest, you wanted the non-compete?
>
> A   Yes. I mean, I certainly didn't want another auto repair facility or anyone doing repairs in that complex.

(Filing No. 104, at 72:3-22.)

The evidence shows that the restricted use language was important to Stern, and he insisted that it be included in the lease over Bristol's[5] objection. (Filing No. 18 (Bristol's Jan. 18, 2006, Deposition), at 26:11-22.) Bristol was aware of Stern's concern over the restricted use paragraph before he signed the lease. (Filing No. 104, at 38:16-20.)

The provision in question was debated before the lease was signed. The paragraph was important to Stern for the reasons he testified to at trial. Bristol admits that Sports and Imports did automotive repair on vehicles not leased by the business, but without significant supporting evidence he alleges the amount of such business was minimal and, therefore, any breach was not material. The Court disagrees. Under the facts of this case, the paragraph in question was clearly an item crucial in negotiating the lease. In signing the lease, Maple, Inc., legitimately expected to be the only automotive repair business on the site. PPM cites the trial testimony of Mike Heilig, a former employee of Sports & Imports who sold his own vehicles at Sports & Imports and was allowed to bill his customers for limited service work. (*Id.*) However, Bristol was unable to produce any business records for the thirteen years the site was leased to Maple, Inc. of service work. Tax returns for 1999, 2000, 2001, and 2002 (Filing Nos. 53-55, 59), are referred to by both parties in support of their positions and do not resolve the issue. Given the evidence presented, the Court concludes the business in question performed by Sports and Imports, even if limited, was a material breach of the lease.

---

[5]Peter Bristol owns PPM. (Filing No. 45, at 7:4-6.)

## II.     Waiver

PPM argues that, even assuming that the work performed by Sports and Imports was a material breach, Judge Mahoney erred in failing to considering whether Maple, Inc., waived its right to claim a breach after "acquiescing" to the conduct for thirteen years.

"Waiver is a 'voluntary and intentional relinquishment or abandonment of a known existing legal right, advantage, benefit, claim, or privilege, which except for such waiver, the party would have enjoyed.'" *Keene v. Teten,* 602 N.W.2d 29, 38 (1999) (quoting *Five Points Bank v. Scoular-Bishop Grain Co.,* 350 N.W.2d 549, 552 (Neb. 1984)). "To establish waiver of a legal right, there must be a clear, unequivocal, and decisive act of a party showing such a purpose, or acts amounting to an estoppel on his or her part." *Id.* (citing *Schoemaker v. Metropolitan Utils. Dist.,* 515 N.W.2d 675 (Neb. 1994)).

Stern testified at his deposition that during the initial lease period of 1989-94 he once confronted Bristol about what he perceived to be a violation of the restricted use paragraph. However, Stern stated that Bristol assured him that the work being performed was on vehicles that Sports and Imports was either renting or preparing for sale, and Bristol said he was not competing with Stern's business in any way or running a retail repair facility.  (Filing No. 19, at 18:16-21; 19:16-21.)  Stern did not remember raising the issue with Bristol during the 1994-1999 lease period.  (*Id.* 20:1-5.)  In February 2000, while negotiating the new lease, Stern wrote to Bristol regarding Sports & Imports' alleged continuing violation of the restricted use paragraph in the previous lease.  (Filing No. 22.) Stern testified that he did not spend much time other than isolated visits to the location between 1989 and July 2002, when he negotiated a termination of Mark Nobel, who had

managed the business since its inception. Nobel was terminated because he embezzled approximately $60,000 from Maple, Inc. (Filing No. 104, 62:1-11; 92:1-13.) Mike Wickert replaced Nobel as manager. (*Id.*, at 62:12-15.) Wickert expressed concern to Stern about Sports and Imports' repair work. He was suspicious because employees from Sports and Imports came to Maple, Inc. to use its repair database to search for information for what they called "customer cars." Those discussions led Stern to investigate on his own at the business. (*Id.,* at 67:23-68:10.)

The record shows that, while Stern had suspicions about Sports and Imports' conduct, Bristol minimized Sports & Imports' competing business when Stern confronted him with his suspicions. Stern's letter was again an expression of his suspicions expressed in light of the impending renegotiation of the lease. Under the facts presented, Stern's actions cannot be considered a waiver of the breach.

## CONCLUSION

For the reasons stated above, the judgment of the bankruptcy court will be affirmed. A separate Order and Judgment will be entered in accordance with this Memorandum Opinion.

DATED this 18th day of January, 2011.

BY THE COURT:

s/Laurie Smith Camp
United States District Court